UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARGO F. PINARD,                      )
                                      )
        Plaintiff,                    )
                                      )    No.  4:06CV01417 FRB
                                      )
v.                                    )
                                      )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,[1]   )
                                      )
        Defendant.                    )

**<u>MEMORANDUM AND ORDER</u>**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural Background**

On August 31, 2004, Ms. Margo F. Pinard ("plaintiff") protectively filed applications for a Period of Disability, Disability Insurance benefits, and Supplemental Security Income benefits, alleging that she became disabled on April 2, 2002, due to a ruptured disc, depression, and poor sleep. (Administrative

_____

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Transcript ("Tr.") at 37-39, 41-44.) Plaintiff's applications were initially denied on January 7, 2005. (Tr. 30-33.) Plaintiff filed a Request for Hearing before an Administrative Law Judge ("ALJ") which was received by defendant Agency's Office of Hearings and Appeals on March 1, 2005. (Tr. 58.) On March 7, 2006, a hearing was held before an ALJ in Creve Coeur, Missouri, during which plaintiff testified and was represented by attorney Traci Severs. (Tr. 11, 436-69.) On June 19, 2006, the ALJ issued a decision unfavorable to plaintiff. (Tr. 8-22.) Plaintiff filed a Request for Review of Hearing Decision on June 27, 2006, and the Appeals Council denied plaintiff's request for review on September 13, 2006. (Tr. 3-7.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  **Evidence Before the ALJ**

### A.  <u>Plaintiff's Testimony</u>

At the hearing on March 7, 2006, plaintiff responded to questioning from counsel and the ALJ. Plaintiff was born on October 3, 1942, and was sixty-three years old at the time of the hearing. (Tr. 439.) Plaintiff is divorced, has no minor children and lives alone. (Tr. 439-40.) She is right handed. (Tr. 440.) Plaintiff is five feet, two inches tall and weighs 170 pounds. <u>Id.</u> Plaintiff testified that she had gained fifty pounds during the last three years due to inactivity, and in fact stated that she had not exercised at all. <u>Id.</u> Plaintiff receives early retirement

-2-

benefits from Social Security, and also receives food stamps. (Tr. 440-41.) Plaintiff graduated from high school in 1960. (Tr. 441.) She has a valid driver's license, but stated that she rarely drove due to problems with her neck and a "falling asleep" sensation in her right arm. (Tr. 441-42.) Plaintiff testified that her brother drove her to the hearing. (Tr. 458.) Plaintiff testified that she occasionally drives short distances to visit the pharmacy, the grocery store, and a farmer's market. (Tr. 442, 458.) Plaintiff testified that she had trouble walking through the stores, and that she had to hold onto the shopping baskets for support. (Tr. 465.)

Plaintiff last worked at Correct Cap Company as a factory manager, a job which involved answering telephones, taking orders, preparing orders to be sewn, shipping, receiving, sending faxes, and the like. (Tr. 442-43.) Plaintiff held this job from 1998 to 2002. (Tr. 443.) Plaintiff testified that this job required walking "most of the time," and required her to lift things such as rolls of fabric and boxes full of caps to be shipped. (Tr. 442-43.) Plaintiff testified that a large box of caps weighed 35 to 55 pounds, and that an order may include ten boxes. (Tr. 443.) Rolls of fabric weighed 75 to 80 pounds, and plaintiff was required to place them on a dolly and take them to a table where they would be stacked. Id. Plaintiff testified that she suffered an on-the-job injury in July 2001, and filed a workers' compensation claim. (Tr. 444.) Plaintiff's workers' compensation claim was still pending at the time of the Social Security hearing. Id. Plaintiff testified

that Correct Cap fired her on April 2, 2002, due to her inability to perform the lifting requirements. (Tr. 443-44.)

Before working at Correct Cap, plaintiff worked for Spot Radiological Group for eighteen months doing filing and computer work. (Tr. 445.) This job required plaintiff to lift only about five to ten pounds. Id. Before this, plaintiff worked for Famous Barr department store as a decorator, which required her to travel to customers' homes and offer decorating advice. (Tr. 446.) This job also required lifting only five to ten pounds. Id.

Plaintiff testified that she was unable to perform any work because she had no control over her right arm, she was unable to lift anything, she dropped things, and she could hardly walk due to the bone graft surgery on her left hip. (Tr. 447.) Plaintiff had one prior neck surgery, for which bone was removed from her right hip, but she has no residual pain in her right hip from that procedure. Id. Plaintiff also testified that she is unable to swallow well. (Tr. 447.) Plaintiff has pain in the back of her neck that felt like "needles in there" and that went down her shoulder toward her back. Id. Plaintiff stated that she is unable to keep her neck down to read or write, and she is unable to bend down and/or return to a straight position due to pain and tightening in her left hip. Id. Plaintiff testified that her doctor told her there was nothing that could be done about the pain in her left hip. (Tr. 448.) Plaintiff stated that her second neck surgery "took," inasmuch as the bones completely fused, but that

-4-

she still has the unexplained symptoms of constant pressure and pain that is not completely relieved by medication. (Tr. 448-49.) Plaintiff testified that she took three pain pills and one sleeping pill. (Tr. 449.) Plaintiff suffers no side effects from her medications. (Tr. 450.)

Plaintiff testified that she constantly has trouble swallowing, and that she saw a doctor who performed a test and recommended that she swallow harder. (Tr. 450.) Plaintiff testified that she cannot eat sweet potatoes, and that she must drink large amounts of water when eating to get her food down. (Tr. 451.) Plaintiff's swallowing difficulties began after her first neck surgery. (Tr. 451-52.)

Plaintiff testified that she had pain and numbness in her right hand, which she attributes to her neck surgeries. (Tr. 452.) These symptoms cause plaintiff to lose control of and drop items she is attempting to lift and carry, such as coffee cups and dishes, and plaintiff makes a point of carrying things very close to her chest to maintain control. Id. Plaintiff testified that this problem prevents her from writing for very long, and also causes problems with drying her hair. (Tr. 453.) Plaintiff testified that she has more grip strength in her left hand and is able to lift and carry a quart of milk or a five-pound bag of potatoes, but that using her left hand causes pain in her neck. (Tr. 454.) Plaintiff also testified that she had trouble reaching with her right arm. (Tr. 459.)

Plaintiff testified that she sleeps six hours per night, and that she takes Trazodone[2] to aid sleep. (Tr. 454.) Plaintiff takes approximately two 15-20 minute naps per day due to pain in her hip and her neck. (Tr. 455.) Plaintiff is able to attend to her personal hygiene, but makes slow progress due to pain in her right arm. Id. Plaintiff is able to wash her own nightgowns and other lightweight items, but needs help laundering items such as towels and sheets. (Tr. 457.) Plaintiff testified that she is unable to reach inside the washer and lift the wet items due to pressure and pain in the back of her neck. Id. Plaintiff cooks for herself, but has trouble with tasks such as stirring, mixing, and peeling potatoes. (Tr. 457-58.) Plaintiff testified that her brother helps her cook, and also takes her to the grocery store to help her with lifting cans. (Tr. 458.) Plaintiff is able to bathe/shower every day, and also takes care of her small dog. (Tr. 459-60.) Plaintiff reads books, but must position the book in an elevated position using a little pillow situated on a table. (Tr. 460.) Plaintiff also watches television and works word puzzles, which she must also situate in a manner similar to her books. (Tr. 460-61.) Plaintiff testified that she alternates the foregoing activities throughout her day. (Tr. 461.)

Plaintiff testified that there were very few articles of clothing she was able to wear, as she was unable to wear anything

---

[2]Trazodone is indicated for use in the treatment of depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

with a collar, but would wear a scarf in cold weather.  (Tr. 456.)
Plaintiff testified that she cut the necks and collars off of her
nightgowns and dusters that she wears around the house.  Id.
Plaintiff testified that she was unable to wear jewelry.  Id.

Plaintiff's pain precludes her involvement in hobbies she
once enjoyed, such as gardening, cooking, and housekeeping.  (Tr.
461.)  Plaintiff does not belong to any clubs or organizations.
(Tr. 462.)  Approximately once per month, plaintiff goes out to
dinner with a friend, but stated that her social life has suffered
since her surgeries.  (Tr. 462-63.)

Plaintiff can sit for 30-45 minutes before having to lay
down for a little while due to pressure in her back and hip.  (Tr.
463.)  Plaintiff is unable to stand in one place due to pressure on
her left hip.  Id.  Plaintiff is able to walk around her house with
her dog, but cannot take him for an outdoor walk because his
pulling on the leash causes pain and pressure in plaintiff's neck.
(Tr. 464.)

Plaintiff then responded to questioning from the ALJ.
Plaintiff testified that in 1994, she worked full-time as a resale
shop owner, and also worked for two months in 2004 at Tip Top
Cleaners.  (Tr. 466.)  Plaintiff left Tip Top Cleaners to have her
second surgery.  Id.  Plaintiff filed for unemployment compensation
after she stopped working for Correct Cap.  Id.

Plaintiff's attorney then re-examined plaintiff.  (Tr.
467-68.)  Plaintiff testified that, when she applied for

-7-

unemployment compensation, she did not know that her injuries were as bad as they were, and she felt that, if she could find a job less demanding than her work at Correct Cap and also find a way to relax, she would be able to work. (Tr. 467.) Plaintiff testified that she tried many methods, including cortisone shots and chiropractic care, to alleviate her symptoms in her neck, all to no avail. (Tr. 467-68.)

B.  Medical Records

The record indicates that plaintiff was treated by Dr. Kathleen Garcia from October 30, 2001 to January 8, 2002 with complaints of neck and shoulder pain. (Tr. 425-27.) Dr. Garcia assessed a cervical strain and right shoulder strain, and referred plaintiff to Leesa M. Galatz, M.D. for further evaluation. (Tr. 426-27.)

Plaintiff saw Dr. Galatz on May 28, 2002. (Tr. 376-77.) Dr. Galatz noted plaintiff's complaint of right-sided neck and arm pain, and complaints of numbness in her forearm and hand. (Tr. 376.) Plaintiff exhibited full range of motion of her shoulder and neck, mild tenderness at her AC joint, and some pain with rotation and tilting toward the right. Id. X-rays of plaintiff's shoulder were unremarkable. Id. Dr. Galatz assessed cervical radiculopathy. Id.

On June 7, 2002, plaintiff saw John P. Metzler, M.D., of the Orthopaedic surgery department at Washington University Medical Center. (Tr. 374-75.) Plaintiff reported pain in her right upper

trapezius extending into her right shoulder and down her right arm, which had become progressively more severe since July 2001. (Tr. 374.) Plaintiff was noted to be alert and pleasant, in no acute distress. (Tr. 374-75.) Physical examination revealed mild pain with rotation to the right, but was otherwise normal. Id. Plaintiff's radiological tests showed very mild degenerative disc disease involving C5-6. (Tr. 375, 407.) Dr. Metzler assessed probable right C6 radiculopathy. Id.

Plaintiff returned to Dr. Metzler on August 20, 2002. (Tr. 373.) Plaintiff reported marked improvements in her pain following a right C6 nerve block on July 1 and physical therapy, but also reported that her pain had become more pronounced over the past several weeks. Id. Dr. Metzler assessed right C5-6 disc herniation with right C6 radiculopathy, and scheduled plaintiff for a second C6 nerve block and physical therapy. Id. Plaintiff returned on September 10, 2002 and reported little relief from her symptoms following a second C6 injection, and further reported having headaches radiating up the back of her head. (Tr. 372.) Dr. Metzler assessed C4-5, C5-6 degenerative disc disease with foraminal narrowing, and recommended a C4-5 injection and continued home exercise. Id.

On October 28, 2002, plaintiff presented to David S. Raskas, M.D., of St. Louis Spine Care Alliance, with complaints of neck pain and pain radiating into her right shoulder following a July 2001 injury which occurred at work while plaintiff was lifting

bolts of fabric. (Tr. 293-95.) Dr. Raskas noted that plaintiff had undergone three nerve root blocks and physical therapy, but that relief only lasted a couple of weeks. (Tr. 293.) Dr. Raskas assessed a probable disc herniation at C5-6, and ordered a myelogram/CAT scan which was performed on November 4, 2002. (Tr. 295, 318.)

Plaintiff returned to Dr. Raskas on November 11, 2002, at which time Dr. Raskas reviewed plaintiff's CT myelogram, which showed no disc herniation, but did show mild, degenerative changes at C4-5 and C5-6 slightly lateralized to the right. (Tr. 289, 318.) Cervical spine films obtained this same date revealed degenerative disk disease and cervical spondylosis at C4-5 and C5-6 with mild lateralization of changes to the right at C5-6, but no dominant protrusion or definite neural element encroachment. (Tr. 319.) Dr. Raskas recommended a nerve conduction study. Id. Plaintiff returned to Dr. Raskas on November 22, 2002, at which time Dr. Raskas noted that her EMG/nerve conduction studies were completely normal, her myelogram showed no nerve root impingement, and there was no evidence of a herniated disc. (Tr. 286.) Dr. Raskas referred plaintiff to Dr. Hulsey for further evaluation of her shoulder. Id.

Plaintiff saw Richard E. Hulsey, M.D., on January 27, 2003. (Tr. 366-67.) Dr. Hulsey noted that plaintiff's MRI showed a small C5-6 extrusion on the right side, and noted that plaintiff reported no significant relief following local injections. (Tr.

-10-

366.) Dr. Hulsey noted no atrophy or deformity. (Tr. 367.)
Plaintiff had diffuse tenderness over the base of the right neck
down to the superior angle of the scapula, mild tenderness over the
shoulder, limited range of motion secondary to pain, and no
radicular discomfort. Id. Upon encouragement, plaintiff had full
range of motion of her shoulders, but did complain of pain in her
neck. Id. Dr. Hulsey could not reproduce any sensory loss,
although plaintiff complained of some paresthesias in the ulnar
nerve distribution. Id. Dr. Hulsey assessed myofascial pain
versus referred discomfort from plaintiff's cervical neck, and
further noted that plaintiff had some mild rotator cuff changes
that were most likely not contributing to plaintiff's neck
symptoms, and referred plaintiff to Dr. Raskas for an opinion
regarding whether further treatment was needed for plaintiff's
neck. Dr. Hulsey assessed no specific restrictions relative to
plaintiff's shoulder. Id.

On April 25, 2003, Dr. Raskas reviewed plaintiff's June
17, 2002 MRI. (Tr. 284.) Dr. Raskas noted a central protrusion of
the disc at the C4-5 level, and a slight right-lateralizing
protrusion at C5-6. Id. Dr. Raskas noted that plaintiff exhibited
vigorous complaints of pain and headaches, and noted that x-rays
obtained on that date revealed retrolisthesis of C4 upon C5. Id.
Dr. Raskas opined that plaintiff had failed all conservative
measures and recommended another MRI, which was performed on April
30, 2003. (Tr. 285, 320.) Plaintiff returned to Dr. Raskas on May

5, 2003, at which time Dr. Raskas interpreted plaintiff's MRI as showing symmetric lateralization to the right at C5-6, and a central protrusion disc at the C4-5 level. (Tr. 282, 320.) Dr. Raskas opined that, because eighteen months of conservative treatment, had failed to produce long-term relief, surgical decompression/fusion at C4-5 and C5-6 was necessary. Id.

On May 20, 2003, plaintiff underwent C4-5, C5-6 anterior diskectomies and anterior cervical fusion and plating at Missouri Baptist Medical Center by Dr. Raskas and Barry Samson, M.D. (Tr. 331-33.) This procedure included a bone graft, and bone was harvested from plaintiff's iliac crest. Id.

Plaintiff saw Dr. Raskas on June 4, 2003. (Tr. 280.) Dr. Raskas noted that plaintiff's pre-operative pain had completely resolved, she was "doing excellent clinically." Id. Cervical spine films revealed healing cervical fusion. (Tr. 306.) Plaintiff saw Dr. Raskas again on July 14, 2003. (Tr. 278.) Neurologic exam was normal, and physical exam revealed limited range of motion of her neck, but complete relief of pre-operative arm pain. Id. Cervical spine films revealed healing cervical spine fusion. (Tr. 305.) Dr. Raskas recommended physical therapy, and the record indicates that plaintiff attended physical therapy at PRORehab with physical therapist Rebecca D. DeMargel, M.S./P.T., for a total of 11 out of 12 scheduled sessions. (Tr. 278, 307-08.) Ms. DeMargel indicated that, over the course of physical therapy, plaintiff reported neck pain and general cervical/scapular muscular

-12-

soreness. (Tr. 307.) Ms. DeMargel noted that plaintiff's active right shoulder elevation remained limited compared to the left, but that the quality of movement had significantly improved. Id. Ms. DeMargel noted that she was unable to perform a final reassessment of plaintiff's progress because plaintiff cancelled her last appointment due to lack of transportation. Id.

On August 18, 2003, plaintiff saw Dr. Raskas, who noted that plaintiff was not progressing in physical therapy in terms of lifting. (Tr. 276.) Dr. Raskas noted that plaintiff's upper extremity pain was markedly relieved, but that plaintiff had some limited range of motion of the neck and some axial pain. Id. Dr. Raskas noted that plaintiff's cervical x-rays looked "pretty good," and recommended plaintiff continue physical therapy. Id. Cervical spine films taken on this date revealed "healing cervical fusion." (Tr. 304.)

On September 15, 2003, Dr. Raskas noted that plaintiff's x-rays showed that her cervical fusion was apparently solid. (Tr. 273.) An X-ray report of this date revealed "mildly solid fusion C4 to C6." (Tr. 303.) Plaintiff noted that her neck and shoulder symptoms were markedly improved, but had not disappeared. (Tr. 273.) Plaintiff complained of difficulty swallowing and numbness around the area of her incision. Id. Dr. Raskas prescribed

Vioxx,[3] and noted that plaintiff was taking Darvocet[4] and Skelaxin.[5] Id. Physical exam revealed mildly limited range of motion and normal strength and sensation. Id. Dr. Raskas continued plaintiff on physical therapy. Id.

On December 3, 2003, plaintiff saw Dr. Raskas with complaints of neck pain and stiffness, difficulty swallowing, and numbness in her skin and cheek area. (Tr. 271.) Cervical spine films taken on this date revealed probable solid fusion from C4 to C6. (Tr. 302.) Dr. Raskas recommended a CT scan, which was performed on December 4, 2003. (Tr. 301, 309.) On December 8, 2003, Dr. Raskas reviewed the CT and noted that the C4-5 graft was completely incorporated, but the C5-6 graft was not. (Tr. 269, 301, 309.) Dr. Raskas suggested a repeat CT in six months to evaluate whether incorporation was achieved. Id.

On March 5, 2004, plaintiff saw David Volarich, D.O., for an independent medical exam ("IME"). (Tr. 195-203.) Dr. Volarich noted plaintiff's employment with Correct Cap Company from 1993 to 1998, and from 2000 to 2002. (Tr. 196.) He further noted plaintiff's on-the-job injury to her neck and right shoulder on

---

[3]Vioxx, or Rofecoxib, is used to treat the pain, tenderness, inflammation, and stiffness caused by, inter alia, arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699046.html

[4]Darvocet is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

[5] Skelaxin, or Metaxalone, is a muscle relaxant which is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682010.html

July 1, 2001, and her May 20, 2003 surgery. (Tr. 196-97.) Plaintiff complained of headaches, restricted range of motion and pain in her neck, right shoulder pain, difficulty swallowing, difficulty lifting things such as a gallon of milk, and difficulty with such things as styling her hair. (Tr. 198.) Dr. Volarich noted that plaintiff was five feet, two inches tall, and weighed 181 pounds. (Tr. 199.) Dr. Volarich examined plaintiff and found that she had a disc protrusion at C5-6 and unrepaired pseudoarthrosis at C5-6, and also noted that plaintiff had restricted range of motion of the cervical spine and muscle spasm. (Tr. 200-01.) Dr. Volarich opined that plaintiff had not reached maximum medical improvement following her May 20, 2003 surgery, and opined that plaintiff would likely require a second C5-6 surgical fusion. (Tr. 199-202.)

On September 7, 2004, Dr. Raskas and David Kennedy, M.D., performed a posterior cervical fusion at C5-6, which also included an iliac crest bone harvesting procedure, at Missouri Baptist Medical Center. (Tr. 248-49.)

On October 25, 2004, plaintiff saw Dr. Raskas for post-operative follow-up with complaints of low back pain seemingly resulting from the removal of some adhesive from her skin following surgery, and difficulty moving her right shoulder. (Tr. 266.) Dr. Raskas noted that plaintiff's neurologic exam was normal, and recommended physical therapy. Id.

Plaintiff saw Dr. Raskas again on December 13, 2004 with

a variety of different pain complaints, including pain over her incision, pain in her shoulder, neck, and low back, and headaches. (Tr. 265.) Plaintiff was taking Hydrocodone. Id. Dr. Raskas noted that plaintiff had made some progress in terms of shoulder range of motion, but that her pain disability scores in physical therapy were higher than they were before the commencement of therapy. Id. An x-ray on this date showed a solid fusion at C4-5, and developing fusion at C5-6. (Tr. 299.) Dr. Raskas referred plaintiff for pain management. Id.

On December 20, 2004, plaintiff was seen by Andrew M. Wayne, M.D., of Orthopedic and Sports Medicine. (Tr. 321-22.) Plaintiff complained of ongoing neck pain, weakness and numbness in her right upper extremity, and right arm pain. (Tr. 321.) Plaintiff reported being able to sit for up to 30 minutes at a time, and stated that she had difficulty with prolonged walking and standing but did not use an assistive device. Id. Dr. Wayne noted markedly restricted cervical and lumbar range of motion, and observed as follows: "I strongly believe that she is self-limiting herself with neck motions in addition to lumbar motions." (Tr. 332.) Straight leg raise was negative bilaterally. Id. Range of motion of the shoulders was "markedly" restricted on the right and "moderately" restricted on the left, and elbow range of motion was normal. Id. Grip strength was 4+/5 on the left and 4/5 on the right with "fair to good effort." Id. Plaintiff had generalized tenderness in the cervical and upper thoracic distribution without

-16-

any significant muscle spasm.  (Tr. 332.)  No significant atrophy was noted in the upper or lower extremities.  Id.  Plaintiff's gait was slightly slow but nonantalgic.  Id.  Dr. Wayne then noted, "[s]he does moan quite a bit during the evaluation."  Id.  Dr. Wayne's impression was right upper extremity weakness and numbness secondary to surgery.  (Tr. 332.)

Dr. Wayne noted that, from a functional standpoint, plaintiff could benefit from a special side view mirror to use while driving to eliminate the need to turn her head to see her blind spot.  Id.  Dr. Wayne advised plaintiff to limit her lifting and carrying to no more than ten pounds.  Id.  Dr. Wayne saw no need for an assistive device, and saw no limitations in plaintiff's ability to stand and/or walk throughout a regular workday with normal breaks, sit with normal break times, or to use her upper extremities for fine motor activities.  Id.  Dr. Wayne opined that plaintiff was able to understand and remember instructions, sustain concentration and persistence with tasks, and was also able to interact socially and adapt to her environment with no significant limitations.  (Tr. 332.)

On January 7, 2005, Ms. Geri Boeger completed a Physical Residual Functional Capacity ("RFC") Assessment form.  (Tr. 98-106.)  Therein, she indicated plaintiffs' diagnoses as cervical spondylosis/herniation, and hip/back strain.  (Tr. 98.)  Ms. Boeger indicated that plaintiff had ongoing neck pain and had undergone two surgeries and nerve block treatments.  (Tr. 99.)  Ms. Boeger

-17-

indicated that plaintiff could lift and carry ten pounds frequently, and could stand/walk for at least two hours in a workday. (Tr. 99.) Plaintiff was able to sit for six hours, and had unlimited ability to push and/or pull. Id. Ms. Boeger indicated no other limitations, despite the fact that plaintiff reported an inability to perform many activities of self-care. (Tr. 100-103.) Ms. Boeger indicated that she found plaintiff partially credible. (Tr. 103.) Ms. Boeger noted the lack of any formal treatment for plaintiff's alleged depression. (Tr. 106.) Ms. Boeger concluded as follows: "This claim will result in a denial at this time due to her being able to perform past work as generally performed in the economy." Id.

On January 28, 2005, plaintiff underwent a myelography of her cervical spine, which revealed interbody fusion at C4-5 and C5-6 levels, with no evidence of non-union. (Tr. 246.) A CT of plaintiff's cervical spine performed on this same date revealed mild spondolytic and degenerative changes at the C2-3 and C3-4 levels, good and continuous interbody fusion from C4 through C6, and no evidence of definite lateralizing disc herniation or protrusion. (Tr. 247.)

The record indicates that plaintiff saw Dr. John D. Graham, of Pain Treatment Center, Inc., for pain management treatment as recommended by Dr. Raskas. (Tr. 204-45.) On January 31, 2005, Dr. Graham noted that plaintiff appeared to have an excellent surgical outcome, based upon the results of a January 28,

2005 cervical CT-Myelogram suggesting a continuous and well-united interbody fusion at C4 through C6. (Tr. 227.) Plaintiff was noted to walk without a limp, and to change positions in a smooth and fluid manner. Id. Dr. Graham noted that plaintiff's exam was unremarkable for significant abnormalities. Id. Dr. Graham noted that plaintiff's complaints continued to be out of proportion to objective findings, noting that she reported pain at a 7 or 8 on a 1-10 scale, despite showing no outward signs of distress. Id. Dr. Graham noted that plaintiff was smiling and engaging, and that she laughed and showed no evidence of discomfort when visiting, but upon physical exam, moaned and sighed quite loudly upon any light touch. (Tr. 227.) Dr. Graham noted that plaintiff's grip strength varied back and forth between very minimal strength to moderate, and concluded that this was a non-physiologic finding. Id. Dr. Graham noted as follows: "The patient acts almost histrionic in her behavior and is quite grandiose in her descriptions of the level of disability that she is having." Id. Dr. Graham concluded that, although he expected plaintiff to have some discomfort following a cervical fusion, plaintiff's overall behavior and reported level of dysfunction and disability "simply is inconsistent with the objective findings." Id.

Also on January 31, 2005, Leonard R. Derogatis, Ph.D. completed an interpretative report of plaintiff's symptom profile. (Tr. 230-37.) Dr. Derogatis concluded that plaintiff endorsed a moderate number of symptoms and that the overall intensity of her

-19-

distress was clinical in nature.  (Tr. 232.)  Dr. Derogatis opined
that plaintiff's somatization level was unquestionably in the
clinical range, and concluded that this suggested a focus for
intensive future review.  Id.  Dr. Derogatis also found that
plaintiff had elevated depressive symptoms approaching the clinical
range.  Id.

On February 14, 2005, plaintiff returned to Dr. Graham
and reported doing better.  (Tr. 223.)  Dr. Graham noted that she
was still guarded in her movements of her neck and upper back, and
further noted that plaintiff had been attending physical therapy,
and opined that if she was diligent about her exercises, she would
see good improvement.  Id.  Dr. Graham further opined that
plaintiff should undergo a gradual weaning from her multiple
narcotics in conjunction with increased therapy and activity
levels.  Id.

On February 28, 2005, Dr. Raskas noted that he had
reviewed plaintiff's CT scan and concluded that plaintiff had
achieved a solid fusion and that, from a surgical standpoint,
plaintiff was at maximum medical improvement, with some remaining
pain management issues.  (Tr. 264.)

Plaintiff saw Dr. Graham on March 2, 2005.  (Tr. 217.)
Dr. Graham noted that plaintiff would not move her neck, stating as
follows: "She actually jumps up out of a chair and shifts position
of her entire body to look at you versus moving her neck, even a
matter of a few degrees."  Id.  Dr. Graham noted that light

-20-

touching, too light even to indent the skin, anywhere about her neck, trapezius or upper back, elicited audible moaning and groaning. Id. Plaintiff reported stomach upset with Neurontin,[6] which was discontinued. Id. Plaintiff's medications were Vicodin,[7] Daypro,[8] Skelaxin and Trazodone. Id. Dr. Graham opined that plaintiff was overly dramatic, and that her behavior simply did not coincide with her reports. (Tr. 217.) He noted that, although plaintiff reported improvement in pain, she would not move her neck, and showed a non-physiologic response that any light touch caused her to moan and groan and pull away, even though she had been laughing and joking earlier. Id. He opined that plaintiff should be more aggressive in her physical therapy and her home exercise program. Id.

Plaintiff returned to Dr. Graham on March 23, 2005 and reported doing better, but still did not show much range of motion of her neck. (Tr. 212.) Dr. Graham noted that plaintiff was still "quite dramatic in her description of her discomfort and what she is and is not able to do." Id. Dr. Graham noted as follows: "She still jumps and moans to any light touch of her neck, which would

---

[6]Neurontin, or Gabapentin is used to relieve the pain of postherpetic neuralgia, or PHN, which may last for months or years following an attack of shingles. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html

[7]Vicodin is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[8]Daypro, or Oxaprozin, is used to relieve the pain, tenderness, swelling and stiffness caused by osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693002.html

be consistent with wearing clothing or even a coat touching her. It is noted today that she wears a scarf over her neck and she also wears a heavy wool coat in addition to her other clothing. This would apply more pressure or sensation to the neck than my light touching, yet she wears this without difficulty but any touch causes her to moan, jump and flinch." Id. Dr. Graham continued a downward adjustment to plaintiff's medications, and encouraged plaintiff to be aggressive in physical therapy. Id.

Plaintiff saw Dr. Graham on April 11, 2005 and reported feeling about the same despite several weeks of physical therapy. (Tr. 206.) Dr. Graham wrote that plaintiff had reached maximum medical improvement, and when Dr. Graham suggested discontinuing her Darvocet in favor of Ultram,[9] plaintiff reported being allergic to Ultram. Id. Dr. Graham noted that plaintiff reported no allergies to any medication in her intake paperwork. Id. Dr. Graham opined that plaintiff was capable of at least sedentary work, and released her with a sedentary work limit. Id. Dr. Graham noted that plaintiff stated that she did not think she was capable of even sedentary work due to problems getting dressed. (Tr. 206.) However, Dr. Graham noted that plaintiff reported that she had dressed herself that morning, and that she was always "stylishly dressed" and wearing accessories such as scarves, and concluded that plaintiff would be able to dress herself for work.

---

[9]Ultram, or Tramadol, is used to relieve moderate to moderately severe pain.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

Id. Dr. Graham opined that plaintiff actually functioned at a higher level that what she perceived, and concluded that there was no objective reason why she would be incapable of functioning in at least a sedentary work restriction level. (Tr. 207.)

Physical therapy records indicate that plaintiff underwent physical therapy approximately three times per week with Ms. Mary Openlander, B.S., P.T., from February 8, 2005 through April 8, 2005. (Tr. 250-62.) At the initiation of physical therapy, plaintiff complained of debilitating pain on the right side of her neck and upper back, radiating pain into her right arm, and right arm weakness. (Tr. 253.) Plaintiff reported trouble holding a coffee cup, and stated that she had experienced increased symptoms after discontinuing use of a cervical brace upon doctor's advice. Id. Ms. Openlander noted considerable limitation of plaintiff's cervical and right shoulder range of motion with concomitant weakness, pain exacerbated by even small movements, and tenderness in the scapular region. Id.

On March 1, 2005, Ms. Openlander noted plaintiff reported that she felt better and was encouraged because she exhibited increased range of motion. (Tr. 252.) Ms. Openlander noted some small improvement in shoulder flexion, and better tolerance to touch in the upper back. Id. On March 18, 2005, plaintiff reported an increased activity level, including walking and accompanying her son to the grocery store. (Tr. 251.) Ms. Openlander noted some increase in plaintiff's cervical and shoulder

range of motion, and less soft-tissue hypersensitivity.  Id.  On
April 8, 2005, Ms. Openlander noted that, although plaintiff had
expanded her repertoire of exercises, her progress remained slow.
(Tr. 250.)  Plaintiff reported beginning new activities, such as
emptying the dishwasher.  Id.  Plaintiff was discharged from
physical therapy.  Id.

On June 1, 2005, Dr. Volarich re-evaluated plaintiff and
issued an addendum to his March 5, 2004 IME.  (Tr. 186-194.)  Dr.
Volarich noted that a June 2004 CT had revealed incomplete fusion
and pseudoarthrosis at C5-6, and further noted that plaintiff had
undergone a second C5-6 cervical fusion on September 7, 2004, with
post-operative physical therapy.  (Tr. 187.)  Dr. Volarich noted
that X-rays performed on December 13, 2004 revealed solid fusion at
C405 and developing fusion at C5-6, and that a myelogram and CT of
the cervical spine performed on January 28, 2005 revealed post-
operative changes and continuous well-united interbody fusion at C4
through C6 and degenerative changes.  (Tr. 187-88.)  Dr. Volarich
noted plaintiff's treatment with Dr. John Graham, who had managed
plaintiff's medications and advised in February of 2005 that
plaintiff wean off her medications, and who also noted that
plaintiff had a solid fusion on February 28, 2005.  (Tr. 188.)

Dr. Volarich noted that plaintiff complained of
continued, if not worsened, symptoms of pain in her neck and
limited physical abilities.  Id.  Dr. Volarich noted that plaintiff

was taking Trazodone, Gabapentin, Oxaprozin, and Propoxyphene.[10] (Tr. 189.) Dr. Volarich noted that plaintiff was five feet, two inches tall and weighed 192 pounds. Id. Dr. Volarich noted no significant changes in plaintiff's physical examination compared to his previous exam on March 5, 2004, noting an inability to obtain deep tendon reflexes, diminished pinprick sensation, and weak pinch strength. Id. Plaintiff moved with a slow, stiff gait, complaining of left SI joint pain at the site of her bone graft harvest. Id. Plaintiff exhibited great difficulty squatting and bending down to pick up something from the floor. Id. Plaintiff complained of pain with all motions of the neck, and Dr. Volarich noted that left rotation appeared to cause the most discomfort. (Tr. 190.) Dr. Volarich assessed disc protrusion at C5-6 with associated C4-5 instability, postoperative pseudoarthrosis at C5-6, postlaminectomy syndrome in the cervical spine, and lumbar syndrome. (Tr. 191.) Dr. Volarich opined that plaintiff had reached maximum medical improvement, and recommended that plaintiff undergo vocational evaluation for a determination whether she could re-enter the work force. (Tr. 192.) Dr. Volarich noted: "I have no objection with her attempting to return to work based on the limitations listed at the end of this report." Id. Dr. Volarich opined that plaintiff should avoid the following: repetitive bending, twisting, lifting, pushing, pulling, carrying, and

---

[10]Propoxyphene is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

-25-

climbing; lifting greater than 15 pounds; lifting weight over her head or away from her body; carrying weight over long distances or uneven terrain; and remaining in a fixed position for more than 15-20 minutes. (Tr. 193.) Dr. Volarich recommended that plaintiff pursue an exercise program that included stretching and strengthening, in addition to nonimpact aerobic conditioning such as walking, biking, or swimming. Id.

On June 6, 2005, Ms. Openlander completed a questionnaire in which she assessed plaintiff's work-related capabilities, noting that she had treated plaintiff from February 8, 2005 through April 8, 2005. (Tr. 180-84.) In response to one question asking whether plaintiff was a malingerer, Ms. Openlander indicated that "she is conflicted, she could be convinced to get better under proper supervision." (Tr. 181.) Ms. Openlander opined that plaintiff was capable of low stress jobs, and opined that plaintiff could sit for 30 minutes, stand for 15 minutes, and walk for less than two hours. (Tr. 181-82.) However, Ms. Openlander also indicated that plaintiff could sit for about two hours in an eight hour day. (Tr. 182.) Ms. Openlander opined that plaintiff could not work an eight-hour day. Id. Ms. Openlander did not indicate whether plaintiff's impairments could be expected to improve in 12 months, indicating that this depended on whether plaintiff could do conditioning exercises, which could cause improvement over time. (Tr. 180.)

On September 7, 2005, plaintiff was seen by Mr. Vincent

Stock, M.A., a Vocational Expert Licensed Psychologist, in conjunction with her Missouri Workers' Compensation Claim. (Tr. 164-69.) Plaintiff indicated that she could no longer work full-time due to constant pain in her neck and low back, low frustration tolerance, headaches, numbness in her fingers, and shoulder pain. (Tr. 165.) She reported suffering an on-the-job injury in July 2001 while lifting bolts of fabric. (Tr. 166.) Mr. Stock noted that plaintiff moved constantly in her chair. (Tr. 166-67.) Plaintiff reported depression and anxiety stemming from bills and her lack of medical insurance. (Tr. 167.) Mr. Stock noted that plaintiff's cognitive functioning was intact, with the exception of her inability perform serial sevens. (Tr. 168.) Plaintiff performed serial threes. (Tr. 167.) Mr. Stock opined that plaintiff's difficulty with serial sevens indicated an impairment in plaintiff's ability to maintain concentration, persistence and pace. (Tr. 168.) Her academic performance was in the average range, consistent with her age and level of education. Id. Mr. Stock indicated that plaintiff felt that she was incapable of handing a full-time position due to her pain and significant work limitations. (Tr. 169.) Mr. Stock assessed a GAF of 45. (Tr. 168.)[11]

---

[11]In addition, on September 30, 2005, Mr. Stock wrote a letter to plaintiff's workers' compensation attorney indicating that he had reviewed Dr. Volarich's June 1, 2005 addendum. (Tr. 170-71.) Mr. Stock noted Dr. Volarich's opinions regarding plaintiff's work restrictions, and concluded that the addendum did not change his September 7, 2005 opinion regarding plaintiff's ability to handle a full-time employment position, and indicated that plaintiff's limitations were significant. (Tr. 170.)

Dr. Graham's records also reflect treatment plaintiff received from August 4, 2005 through December 9, 2005. (Tr. 173-78.) These materials indicate that Dr. Graham prescribed Neurontin, Darvocet, Trazodone (as a sleep aid), and Daypro, and also indicate that plaintiff was applying for disability. (Tr. 173.)

On October 12, 2005, plaintiff saw Dr. Graham for routine follow-up. (Tr. 177-78.) Dr. Graham noted that plaintiff's symptoms had not improved, but that she was tolerating her medications without complaint. (Tr. 177.) Dr. Graham indicated that plaintiff should begin weaning off Neurontin, and should continue taking Daypro, Darvocet, and Trazodone. Id. Dr. Graham noted that plaintiff was applying for social security disability, and stated "I simply cannot agree with this concept. The patient clearly is capable of functioning as a 63-year-old female. She certainly is capable of employment. . . . I think Ms. Pinard is quite capable of functioning and she functions quite well." Id. Dr. Graham also noted that he did not see "anything that would objectively make her totally disabled." Id. Dr. Graham concluded that he encouraged plaintiff to go out and get back into work, indicating that would be "the best thing for her." (Tr. 178.)

**III. The ALJ's Findings**

The ALJ found that plaintiff had not engaged in substantial gainful activity since April 2, 2003, despite some

evidence that plaintiff did perform some work since her alleged onset date. (Tr. 12.) The ALJ found that plaintiff suffered from the impairment of status-post discectomy/fusion surgeries for degenerative disc disease of the cervical spine, but that she did not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 21.) The ALJ found that plaintiff had the RFC to perform work-related activities involving lifting and/or carrying up to ten pounds, sitting for up to six hours in an eight-hour work day, and standing/walking for up to two hours in an eight-hour work day. (Tr. 22.) The ALJ found that plaintiff's allegations of impairment-related limitations were only credible to the extent of this RFC. Id. The ALJ found that plaintiff's RFC did not preclude her performance of her past relevant work as an office manager as that job is performed in the national economy. Id.

For his RFC findings, the ALJ noted that the objective medical evidence did not show that plaintiff had any disabling impairment that lasted 12 continuous months. (Tr. 17.) The ALJ noted that, even though plaintiff required two surgical fusion procedures, there was no medical evidence that plaintiff would have been restricted from lighter duty work activity at any time after the initial recovery period. Id. The ALJ further noted that all of the objective medical evidence suggested that plaintiff recovered as expected from her second surgery. Id. In support,

the ALJ noted that plaintiff's treating physicians never indicated that plaintiff's limitations precluded all work. Id. The ALJ also cited the opinion of Dr. Wayne, who observed that plaintiff had no muscle atrophy in the upper or lower extremities, which would indicate that both extremities were engaged for significant periods on a daily basis. (Tr. 17.) The ALJ also noted Dr. Graham's January 31, 2005 opinion that it appeared objectively that plaintiff had an excellent outcome from her second surgery, that objective testing had revealed the achievement of complete fusion, and that plaintiff's subjective complaints were out of proportion to her objective findings. Id.

In evaluating plaintiff's subjective complaints, the ALJ cited Polaski v. Heckler, and stated that he had carefully considered the factors therefrom. (Tr. 12, 20.) The ALJ then noted: "There is a wealth of evidence demonstrating that the claimant exaggerates symptoms." Id. The ALJ noted that this evidence included Dr. Raskas' observations that plaintiff had a variety of subjective complaints despite the absence of objective findings, and the observations from Dr. Wayne, who opined that plaintiff was self-limiting her cervical and lumbar range of motion. (Tr. 17.) The ALJ also noted the numerous observations by Dr. Graham that plaintiff was likely exaggerating her symptoms and impairment-related limitations. (Tr. 17-18.) The ALJ, citing Gaddis v. Chater, 76 F.3d 893, 895-96 (8th Cir. 1996) and Dodd v. Sullivan, 963 F.2d 171, 172 (8th Cir. 1992) concluded that he was

-30-

discounting plaintiff's subjective complaints because she appeared to be motivated to qualify for disability benefits. (Tr. 18.)

The ALJ also found significant evidence that plaintiff had been noncompliant with treatment recommendations that might improve her daily functioning; namely Dr. Graham's March 2, 2005 opinion that plaintiff should do more in terms of physical therapy and home exercise, and Ms. Openlander's observation that plaintiff could improve with proper supervision. Id. The ALJ also found that plaintiff's testimony regarding her limitations was not credible, and concluded that plaintiff had a sedentary lifestyle by choice, not because of her physical limitations. (Tr. 20.)

Regarding plaintiff's ability to perform her past relevant work as an office manager, the ALJ found that the Dictionary of Occupational Titles, or "DOT," specified that the requirements of an office manager job did not require the ability to perform duties at greater than a sedentary exertional level. (Tr. 21.) Having found plaintiff able to return to her past relevant work, the ALJ concluded that plaintiff was not under a disability as defined in the Act at any time through the date of the decision. (Tr. 22.)

## IV. Discussion

To be eligible for Social Security disability benefits under the Social Security Act, a claimant must prove his disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.

-31-

2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to persons who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled.

The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, this Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and consulting physicians;

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.    Any corroboration by third parties of the plaintiff's impairments;

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff claims that the ALJ's decision is not based upon substantial evidence on the record as a whole. In support of this contention, plaintiff argues as follows: (1) the ALJ erred in determining plaintiff's residual functional

capacity ("RFC") inasmuch as he failed to consider plaintiff's non-exertional impairments, including pain, depression, reduced grip strength and range of motion, the need to change positions frequently, and the need for a special side-view vehicle mirror; (2) in light of the presence of non-exertional impairments, vocational expert testimony was required; (3)the ALJ incorrectly identified plaintiff's past relevant work; (4) the ALJ failed to fully and fairly develop the record inasmuch as he did not re-contact plaintiff's treating physicians; (5) the ALJ failed to properly consider plaintiff's age, education, and work background per the Guidelines; and (6) the ALJ erred in his consideration of plaintiff's receipt of unemployment benefits. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A.    <u>Residual Functional Capacity Determination</u>

As set forth, <u>supra</u>, the ALJ in this case determined that plaintiff retained the RFC to perform her past relevant work as an office manager. As noted, <u>supra</u>, plaintiff argues that the ALJ's RFC determination was in error. A review of the ALJ's RFC determination reveals that it is supported by substantial evidence on the record as a whole.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record,

including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

It is well-settled law that the ALJ is required to ensure a fully and fairly developed record. Nevland, 204 F.3d 853 (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). Included in this duty is the responsibility of ensuring that the record contains evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland, 204 F.3d at 858; see Strongson v. Barnhart, 361

-36-

F.3d 1066, 1071-72 (8th Cir. 2004).  A reviewing court has the duty of determining whether the record presents medical evidence of the claimant's RFC at the time of the hearing.  <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995).  Unless the record contains such evidence, the ALJ's decision cannot be said to be supported by substantial evidence.  <u>Id.</u>

   1. <u>Non-Exertional Impairments</u>

   The undersigned turns first to plaintiff's contention that the ALJ failed to properly consider her non-exertional impairments, including pain, in formulating plaintiff's RFC.  In this case, the ALJ thoroughly analyzed and discussed the medical evidence of record, and analyzed plaintiff's subjective complaints of pain and limitations precluding all work, citing <u>Polaski</u> and specifically stating that he had considered all of the factors therefrom.  Regarding plaintiff's allegations of disabling pain, the ALJ noted the "wealth of evidence" in the record demonstrating that plaintiff exaggerated her symptoms, and concluded that the record did not support plaintiff's claims that her pain precluded all work.  In so finding, the ALJ thoroughly discussed the many occurrences in the records of plaintiff's treating physicians Drs. Raskas and Graham, in which they concluded that plaintiff was very likely exaggerating her symptoms. (Tr. 17-18.)  The ALJ noted that Drs. Raskas and Graham based these conclusions upon both findings that plaintiff's subjective complaints were out of proportion to the objective medical findings, and that plaintiff's behavior,

-37-

appearance and dress, and her performance during physical examination and strength/range of motion testing, suggested that she was greatly exaggerating her symptoms. (Tr. 17-18.) The ALJ further noted the opinion of Dr. Wayne, who observed that he "strongly believe[d] that she is self-limiting herself with neck motions in addition to lumbar motions" when plaintiff demonstrated a minimal ability to move her neck and lumbar spine. (Tr. 17.) Citing Gaddis, 76 F.3d at 895-96 and Dodd, 963 F.2d at 172, the ALJ discounted plaintiff's subjective complaints because, inter alia, she appeared to be motivated to qualify for disability benefits. (Tr. 18.)

The ALJ also addressed plaintiff's allegations of significant functional restrictions, including reduced grip strength, reduced range of motion, and the need to change positions frequently, as noted by Dr. Volarich who examined plaintiff on one occasion. The ALJ noted that, although Dr. Volarich opined that plaintiff had workplace restrictions, the opinions of plaintiff's treating physicians, Drs. Graham and Raskas, were entitled to greater weight, especially in light of the fact that Dr. Volarich saw plaintiff only once, and because the treating physicians' opinions were consistent with the clinical findings while Dr. Volarich's opinion was not. (Tr. 19.) The Eighth Circuit has recognized that an ALJ is bound to accept "alleged functional limitations and restrictions due to pain and other symptoms" only to the extent that they can "reasonably be accepted as consistent

with the medical signs and laboratory findings and other evidence."
Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004). The ALJ
also noted Dr. Wayne's observation that plaintiff was self-limiting
herself during neck and lumbar range of motion testing, and Dr.
Graham's observation that plaintiff demonstrated varying strength
in an inconsistent manner, a non-physiologic finding. (Tr. 17-18.)

The ALJ also noted Dr. Graham's statement in his October
12, 2005 office visit note that he simply could not agree with the
concept of plaintiff applying for disability benefits, inasmuch as
she was certainly capable of employment. (Tr. 15.) In fact, no
physician who examined or treated plaintiff opined that she was
completely incapable of working. This weighs against a finding of
disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir.
2000) (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996)
(lack of significant restrictions imposed by treating physicians
supported ALJ's finding of no disability); Johnson v. Chater, 87
F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to
consider the lack of reliable medical opinions to support a
claimant's allegations of a totally disabling condition; in fact,
this was noted to be the "strongest support" in the record for the
ALJ's determination).

In finding that plaintiff had no severe mental
impairment, the ALJ noted that Mr. Stock's justification for
assessing plaintiff a very low GAF was unclear, given that he did
not even identify a clinical mental health-related diagnosis. (Tr.

19.) The ALJ also noted that Mr. Stock's opinion was inconsistent with other medical evidence in the record, including Dr. Wayne's opinion that plaintiff would be able to understand and remember instructions, sustain concentration and persistence with tasks, interact socially, and adapt to her environment without any significant limitations. Id. The ALJ also noted Dr. Graham's description of plaintiff's general demeanor as "smiling, engaging, laughs, and shows no evidence of any discomfort," Id. The ALJ concluded that, due to the lack of evidence supporting Mr. Stock's assessment, and his apparent misinterpretation of criteria for such a determination, his opinion was entitled to no weight. Id. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Furthermore, the ALJ noted that plaintiff's lack of any previous treatment for a mental health impairment detracted greatly from Mr. Stock's conclusions regarding her mental functioning. (Tr. 19); See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (the lack of regular and sustained treatment is a basis for discounting complaints and is an indication that the claimant's alleged impairments are not severe or significantly limiting for twelve continuous months.)

Regarding plaintiff's allegations of "poor sleep," the ALJ noted that plaintiff testified that she took Trazodone to aid sleep, slept an average of six hours each night, and did not awaken with pain during the night. (Tr. 19.) The ALJ also noted the lack

of any sleep disorder diagnosis, and noted the lack of evidence that plaintiff's medication regimen had changed, indicating satisfactory results.  Id.  The ALJ concluded that plaintiff had no severe sleep-related problem.  Id.

The ALJ also discredited plaintiff's allegation that she had difficulty swallowing.  In so finding, the ALJ noted that the medical evidence of record documented that plaintiff had actually gained weight since undergoing the two neck surgeries, and further noted that plaintiff was never diagnosed with any swallowing disorder.  As an additional matter, the undersigned finds no merit in plaintiff's assertion of error in the ALJ's failure to properly consider her need for a side-view automobile mirror as a non-exertional impairment.  Had plaintiff's past relevant work involved driving, this may be a concern; however, there is no description of plaintiff's past relevant work which includes the need to drive at all, much less drive without the aid of a side-view mirror.

Finally, the ALJ found evidence in the record that plaintiff had been non-compliant with treatment recommendations that might improve her daily functioning.  (Tr. 18.)  The ALJ noted Dr. Graham's March 2, 2005 opinion that plaintiff needed to take a more aggressive approach to her physical therapy and home exercise programs.  Id.  Also noted was Dr. Volarich's opinion that plaintiff should "pursue an appropriate stretching, strengthening, and range of motion exercise program in addition to non-impact aerobic conditioning, such as walking, biking or swimming to

tolerance on a daily basis." Id. The ALJ also noted Ms. Openlander's remark that plaintiff "could be convinced to get better under proper supervision." Id. The ALJ concluded that plaintiff appeared to be actively engaged in behaviors that might enhance her workers' compensation and disability claim, but demonstrated little interest in actually following through with treatment that could restore function and reduce pain, and concluded "[t]his leads to a conclusion that she has grossly exaggerated the severity of her symptoms." The ALJ also noted that plaintiff's treating physicians never recommended that she limit her activities as significantly as she did, and further noted that Dr. Volarich and Ms. Openlander recommended that plaintiff engage in a wider range of activity, not less. (Tr. 20.) See Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001) (ALJ properly discredited subjective complaints of disabling symptoms because of failure to follow through with recommended treatment); Gill v. Barnhart, 2004 WL 1562872, *7 (8th Cir. 2004) (ALJ properly discredited plaintiff's testimony regarding self-limitation of activities which were inconsistent with medical advice).

The undersigned finds that the ALJ in this case properly discredited plaintiff's subjective complaints of pain and other impairments precluding all work, having undertaken the proper analysis. See Gonzales v. Barnhart, 465 F.3d 890, 895-96 (8th Cir. 2006) (substantial evidence supported ALJ's adverse credibility determination when a specialist who treated claimant, a treating

-42-

physician, a physical therapist, and an occupational therapist each noted that claimant was exhibiting signs of symptom exaggeration and that claimant frequently and consistently displayed malingering behavior, and when results of various tests were inconsistent with claimant's complaints of debilitating pain.)  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject.  <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).  When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision should be upheld.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).

### 2. <u>Plaintiff's receipt of unemployment benefits</u>

The undersigned next turns to plaintiff's contention that the ALJ's decision is in error due to the ALJ's improper consideration of plaintiff's receipt of unemployment benefits.  In support, plaintiff contends that, when she applied for unemployment, she did not fully appreciate the severity of her condition, and was merely optimistic about her future ability to work.  Plaintiff further argues that receipt of unemployment benefits does not mean that a claimant is actually able to work.

Indeed, the ALJ herein expressly stated that he considered plaintiff's application for and receipt of unemployment benefits as one factor detracting from plaintiff's credibility. (Tr. 19.)  However, this factor was only one of the many

-43-

credibility factors the ALJ considered, as discussed, <u>supra</u>. Nothing in the ALJ's decision suggests that this factor had a decisive effect, or even that the ALJ gave significant weight to this factor. As the Commissioner correctly notes, the Eighth Circuit has held that it is appropriate for an ALJ to consider an application for unemployment benefits as some evidence, though not conclusive evidence, to negate a claim of disability. <u>Johnson v. Chater</u>, 108 F.3d 178, 180 (8th Cir. 1997) (citing <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1074 (8th Cir. 1991) (Applying for unemployment benefits "may be some evidence, though not conclusive, to negate" a claim of disability)).

### 3. <u>Re-contacting plaintiff's treating physicians</u>

Plaintiff also contends that the ALJ erred in failing to re-contact plaintiff's physician. Plaintiff does not specify exactly which physician or physicians the ALJ should have re-contacted, but does argue that, if the ALJ found an ambiguity or misinterpretation in the opinions of the treating physicians, the ALJ had a duty to re-contact the doctors to clarify the opinions. Plaintiff also argues that the ALJ should have re-contacted her physicians because he disbelieved her complaints of pain, and also submits that Mr. Stock's opinion that plaintiff had a very low GAF created an ambiguity requiring the ALJ to re-contact her physicians. The undersigned disagrees.

"While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not

required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." <u>Goff</u>, 421 F.3d at 791. Furthermore, the Commissioner's regulations require the ALJ to re-contact physicians when the evidence is consistent but is not sufficient to decide whether the claimant is disabled; or, if after weighing the evidence, the ALJ is unable to decide whether the claimant is disabled. 20 C.F.R. § 416.927(c)(3).

In the instant matter, there were no undeveloped "crucial issues" requiring the ALJ to re-contact plaintiff's physicians. Regarding Mr. Stock's opinion, which plaintiff claims supports the conclusion that she is mentally impaired, the ALJ noted that Mr. Stock's assessment was unsupported by the balance of the medical evidence of record, that Mr. Stock did not even formulate a clinical psychological diagnosis of plaintiff. The ALJ therefore concluded that Mr. Stock's opinion did not qualify as probative evidence of plaintiff's true level of functioning. It was therefore not necessary for the ALJ to re-contact plaintiff's treating physicians.

### 4. Vocational Expert Testimony

Plaintiff also argues that the ALJ's RFC determination was erroneous due to the lack of vocational expert testimony. The undersigned disagrees.

As noted, the ALJ in this case determined that plaintiff retained the RFC to perform her past relevant work. Vocational expert testimony is not required when the plaintiff can do her past

-45-

relevant work, regardless of the existence of non-exertional impairments. See Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir. 1996); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990). Plaintiff must first meet her initial burden of proof by showing the existence of a disability precluding the performance of her past relevant work before the testimony of a vocational expert is required. Johnston v. Shalala, 42 F.3d 448, 452 (8th Cir. 1994); Groeper v. Sullivan, 932 F.2d 1234, 1235 (8th Cir. 1991). As discussed in detail, supra, substantial evidence supports the ALJ's assessment of plaintiff's RFC. Because the ALJ found that plaintiff could perform her past relevant work, vocational expert testimony was not required.

     5.   Consideration of Plaintiff's age, education and work background

Likewise, plaintiff's argument that the ALJ failed to properly consider her age, education and work background per the Guidelines is moot. Because the ALJ properly found at step four that plaintiff could return to her past relevant work, he was not required to proceed to step five of the sequential evaluation process, where the burden would have shifted to the Commissioner to prove both that plaintiff retained the RFC to perform other kinds of work, and that such work existed in the national economy. Pearsall, 274 F.3d at 1217; Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (citing Nevland, 204 F.3d at 857. Because this case

never proceeded to step five, the Guidelines are not at issue.

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ conducted an exhaustive analysis of the record, and based his decision on all of the relevant, credible evidence of record, including the objective medical evidence and medical opinion evidence. For the foregoing reasons, the undersigned finds that the ALJ's determination of plaintiff's RFC is based upon substantial evidence on the record as a whole. See Johnson, 87 F.3d at 1017-18 (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

B.   Plaintiff's Past Relevant Work

Plaintiff next argues that the ALJ's decision was in error because the ALJ incorrectly identified plaintiff's past relevant work as an office manager. In support, plaintiff claims that her actual past relevant work requirements included duties above and beyond the requirements of sedentary work. Contrary to plaintiff's contention, however, the ALJ's decision shows that he properly defined plaintiff's past relevant work.

When determining whether a claimant can return to her past relevant work, an ALJ reviews the claimant's residual functional capacity and compares it with the physical and mental

demands of his past work.  Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994) (citing Kirby v. Sullivan, 923 F.2d 1323, 1327 (8th Cir. 1991)).  Contrary to plaintiff's contention, the ALJ is not required to classify a claimant's past relevant work solely on basis of the physical demands of the claimant's *actual* past work. Evans, 21 F.3d at 833.  Even if a claimant is unable to perform the actual job requirements of her past job, if the ALJ finds that she can carry out her past relevant work *as that work is performed generally within the national economy*, the claimant is found not disabled.  Id. at 833-34 (emphasis added).

In this case, regarding her work at Correct Cap Company, plaintiff testified that she worked as the manager of the factory, and indicated in her work history report that she was an office manager for Correct Cap.  (Tr. 145; 442.)  On her work history report, when asked to describe her job duties, she indicated that she was the manager of the office.  (Tr. 148.)  Consistent with plaintiff's description of her past relevant work, the ALJ relied on the description of an office manager in the Dictionary of Occupational Titles ("DOT"), which described an office manager job, as usually performed in the national economy, as sedentary.  (Tr. 21.)  The ALJ then found that, considering all of plaintiff's limitations, she could perform the functional demands and job duties of an office manager as generally required by employers in the national economy.  The ALJ's decision to rely on the DOT's

description of plaintiff's past relevant work is supported by substantial evidence.

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist which would have supported a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001; <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.



_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of August, 2007.